UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ROBERT HASH and GERLENE HASH, *et al.,* | Case No. 1:99-cv-00324-MHW |
| Plaintiffs, | **MEMORANDUM DECISION AND ORDER** |
| v. | |
| UNITED STATES OF AMERICA, | |
| Defendant. | |

## INTRODUCTION

Pending before the Court is Plaintiffs' Motion for Attorneys' Fees and Costs (Dkt. 259). Having reviewed the Motion, Defendant's Response (Dkt. 262), and Plaintiffs' Reply (Dkt. 267) as well as the voluminous supporting documentation submitted by each party, the Court enters the following Order granting the Motion in part and denying in part.

## BACKGROUND

The parties' supporting memorandums accompanying their Joint Motion for Preliminary Approval of Class Action Settlement (Dkt. 248) included a detailed recitation of the procedural history of this case. *Mem. in Supp. of Joint Mot.* at 3-10, Dkt. 248 at

11-18.  Therefore, the Court will provide only a brief summary here to place its decision in context.

The genesis of this case pre-dates the filing of the Complaint in the District of Idaho.  On December 22, 1998, Plaintiffs Robert Hash and Gerlene Hash had joined a proposed class action in the District of Kansas seeking to recover damages arising out of Union Pacific Railroad's ("Railroad") 1997 quitclaim conveyance to the Friends of the Weiser River Trails of an 83.1 mile railroad right-of-way extending from Weiser, Idaho, to New Meadows, Idaho, a portion of which ran through Plaintiffs' properties.  The conveyance was made pursuant to an Interstate Commerce Commission Decision and Notice of Interim Trail Use ("NITU") which allowed the Railroad to negotiate a railbanking and interim trail use agreement in accordance with Section 8(d) of the National Trails System Act, 16 U.S.C. § 1247(d) ("Trails Act").  The District Court of Kansas entered an order transferring their claims to the District of Idaho on venue grounds.

On December 17, 1999, Plaintiffs Robert Hash, Gerlene Hash, William Don Lakey, and Nancy Hawkins ("Plaintiffs") filed an Amended Class Action Complaint in this Court alleging that the conveyance constituted a taking in violation of their Fifth Amendment rights.  *Am. Compl.*, (Dkt. 16).  The Amended Complaint was filed pursuant to the Little Tucker Act.  This statute provides that "district courts shall have original jurisdiction, concurrent with the United States Court of Federal Claims, of . . . [a]ny other civil action or claim against the United States, not exceeding $10,000 in amount, founded

either upon the Constitution, or any Act of Congress . . . ."  28 U.S.C. § 1346(a)(2).

On July 7, 2000, the Court certified this case as a class action under Fed. R. Civ. P. 23.  The class consisted of persons who had an interest in the railroad corridor land who were damaged by the taking in the amount of $10,000 or less or who waived claims exceeding $10,000.

Following certification and notice to class members, the parties categorized the various types of instruments of conveyance to the Railroad's predecessors dating back to the late 1800s.  From approximately 2001 to 2008, this Court initially determined the nature of the interest acquired by the Railroad under the conveyance instruments in each of ten categories; the Federal Circuit Court of Appeals determined the Category 1 interests on appeal; and this Court determined the Category 2, 3, 5, 6, 8, and 10 interests on remand.  Over the years, the Court ruled in favor of Plaintiffs on the question of liability in Categories 1, 2, 3, and 10 and in favor of Defendant in Categories 4, 5, 6, 7, 8, and 9.  Plaintiffs did not appeal the Court's determination with regard to Categories 4, 7, and 9.  The parties then entered into settlement negotiations with respect to Categories 1, 2, 3, 5, 6, 8, and 10.

The settlement process occurred over a period of three years and included assessing the fair market value of the taken parcels as of the date of the taking, December 28, 1995.  The total market value for the parcels was determined to be $883,312. The parties thereafter negotiated a settlement agreement which the Class Representatives reviewed with Class Counsel and ultimately approved.  Counsel for the United States then

sought and received approval of the Stipulation and Settlement Agreement (Dkt. 248-1) from the Surface Transportation Board and the authorized representative of the Attorney General pursuant to 28 C.F.R. § 0.160(a)(2) (2008).

A fairness hearing on the Stipulation and Settlement Agreement was held on September 7, 2011, pursuant to Fed. R. Civ. P. 23(e).  There was one objection which was timely resolved, and the Court approved the Stipulation and Settlement Agreement at the fairness hearing.  Class Counsel now seeks to be reimbursed for attorneys' fees and costs pursuant to the applicable provisions of the Uniform Relocation Assistance and Real Property Acquisition Policies Act, 42 U.S.C. § 4654(c) ("URA").  *Pls.' Mem. in Support of Mot. ("Pls.' Mem.")*, Dkt. 259-1.

In support of its claim, Plaintiffs emphasize that Trails Act cases involved an emerging area of law at the time this action was filed, that the few existing decisions regarding liability and class certification were mixed, that Class Counsel were among the few attorneys in the country handling these cases, and that they were apparently the only attorneys at the time bringing Little Tucker Act cases on behalf of landowners.  *Pls.' Mem.* at 3. Defendant vigorously contested this action for a period of almost ten years on issues regarding class certification, class notification, property interests acquired by the railroad under the various forms of conveyance, Federal Circuit precedent, and the scope of liability and damages for the various categories.  *Id*. at 3-4.

As modified by their Reply, Plaintiffs are seeking attorneys' fees of $2,367,581.13

MEMORANDUM DECISION AND ORDER - 4

and costs of $26,526.66 for a total of $2,394.107.79.[1]  These fees cover approximately 7,300 hours expended over a period of almost thirteen years by three law firms: local counsel Walker Law Office ("WLO"), Ackerson Kauffman Fex, PC ("AKF"), and Zelle Hofmann Voelbel & Mason, LLP ("Zelle").  Class Counsel emphasize that they have received no compensation throughout this litigation and that they are limited under the URA to historical billing rates which effectively reduces their award by 25% when compared with the current rate.  *Id*. at 4-5.

## LEGAL STANDARD

Despite the general policy known as the "American Rule"  requiring each party to bear its own attorneys' fees, Congress has enacted several "fee shifting" statutes pursuant to which a district court may award attorney fees to the prevailing party.  *See Fox v. Vice*, 131 S.Ct. 2205, 2213 (2011) (citing *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 247 (1975)).  The URA is one such fee shifting statute.

The URA  provides in relevant part that in claims against the United States pursuant to the Little Tucker Act in which the Attorney General effects a settlement in a taking proceeding, "the court . . . shall determine and award or allow to . . . plaintiff, as part of such . . . settlement, such sum as will in the opinion of the court . . . reimburse such plaintiff for his *reasonable* costs, disbursements, and expenses, including *reasonable*

---

[1]  In their Motion, Class Counsel had requested attorneys' fees of $2,370,397.93 and costs of $26,734.90 for a total of $2,397,132.83.  Class Counsel made some relatively minor adjustments after receiving Defendant's Response.

attorney, appraisal, and engineering fees, *actually incurred because of* such proceeding."
42 U.S.C. § 4654(c) (emphasis added).  Successful plaintiffs may only recover actual fees
billed despite the fact that historical rates are lower than current rates.  *See Preseault v.
United States*, 52 Fed. Cl. 667, 677 (Fed. Cl. 2002) (noting that compensation for "delay"
and "lost opportunity" is "tantamount" to interest which may not be recovered from the
Government absent an express waiver of sovereign immunity from an award of interest).

The "case law construing what is a 'reasonable' fee applies uniformly" to all
federal fee-shifting statutes.  *City of Burlington v. Dague*, 505 U.S. 557, 562 (1992).  In
determining a reasonable attorneys' fee, the Court must begin with the "lodestar" figure
which is "the number of hours reasonably expended on the litigation multiplied by a
reasonable hourly rate." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983).   There is a
"strong presumption" that the lodestar is the reasonable fee.  *Pennsylvania v. Delaware
Valley Citizens' Council for Clean Air*, 478 U.S. 546, 565 (1986).

The Court may only deviate from the lodestar figure in "rare" and "exceptional"
cases and based only on factors other than those already taken into consideration in the
lodestar calculation.  *Perdue v. Kenny A. ex rel. Winn*, 130 S.Ct. 1662, 1673 (2010).
Stated another way, factors such as  the novelty and complexity of the issues, the special
skill and experience of counsel, the quality of representation, the results obtained, and the
contingent nature of the fee agreement are to be considered when determining the lodestar
amount rather than when determining whether deviation from the lodestar amount is
warranted.  *Bywaters v. United States*, 670 F.3d 1221, 1227 (Fed. Cir. 2010) (citations

omitted).

Although the lodestar approach is not "perfect," it has become "the guiding light" and "achieved dominance in the federal courts" since the *Hensley* decision. *Perdue*, 130 S.Ct. at 1672 (internal citations omitted). Further, the party seeking attorneys' fees must submit adequate evidence supporting the amount of hours worked and rates charged to enable the court to determine the amount of a reasonable fee. *Hensley*, 461 U.S. at 433.

"Something more that an attorney's own affidavit is required to establish the prevailing market rate for attorney's fees." *Preseault*, 52 Fed. Cl. at 678 (internal citations and quotations omitted). Although the URA "does not require 'an itemized statement from any attorney or expert witness . . . stating the actual time expended and the rate at which fees and other expenses were computed,'" plaintiffs must submit sufficient detail upon which the court can determine the reasonableness of the hours, fees, and expenses for each individual for whom they seek reimbursement. *Id*. at 679.

## ANALYSIS

Defendant offers several objections to Plaintiffs' request for fees and costs. It contends that Ninth Circuit law rather than Federal Circuit law applies to the attorneys' fees determination; that Plaintiffs are entitled only to those attorneys' fees and costs incurred in connection with the claims on which they were successful; that the AKF and Zelle firms are not entitled to out-of-forum rates; and that there is significant duplication of effort among the three law firms, excessive hours spent on many tasks, work for non-party clients, and other items not reasonably charged to Defendant. *Response* at 1-2.

After adjusting downward based on its objections, Defendant contends that reasonable attorneys' fees and costs should total no more than $685,099. *Id*. at 2.

Plaintiffs have conceded some of the objections and reduced their claim as set forth in their Reply.[2] *Reply* at 19 and 24. However, there is still a wide disparity in positions. The Court will review each objection in turn being mindful of the fact that *Hensley* counsels that a "request for attorney fees should not result in a second major litigation." *Hensley*, 461 U.S. at 437. After resolving the general objections, the Court will address the reasonableness of the resulting hours and fees.

## 1.    General Objections

### A.    Applicable Circuit Law

Relying in part on a district court decision in a then recently concluded rails-to-trails takings case, Plaintiffs urge the application of Federal Circuit law to the fee request. *See Pls.' Mem*. at 6-7 (citing *Bywaters v. United States*, No. 6:99-CV-451, 2010 WL 3212124  (Fed. Cir. filed Oct. 4, 2010)) (*"Bywaters I"*). Defendant contends that Ninth Circuit law applies.

The District Court for the Eastern District of Texas in *Bywaters I* applied Federal Circuit law reasoning that "the URA provides the mechanism through which attorneys' fees and costs may be awarded for a takings claim, and because a determination of fees under the URA is essentially related to the Plaintiffs' taking claim, it follows that the

---

[2]  Plaintiffs have reduced their claim for attorneys' fees by $2,816.80 and for costs by $208.24.

Federal Circuit would apply its own law to issues of whether a URA fee award is proper." *Bywaters*, 2010 WL 3212124 at *2. The issue was on appeal at the time the parties submitted their briefs.

On March 1, 2012, the Federal Circuit agreed noting its exclusive jurisdiction of claims under the Tucker Act and the Little Tucker Act to which the URA applies, Congressional desire for nationwide uniformity with the application of similar standards of review and circuit precedents, and the circuit's consistent application of circuit law to claims for attorneys' fees under the attorneys' fees provision of the Patent Act which pertains to another area of substantive law within the Federal Circuit's exclusive jurisdiction. *Bywaters v. United States*, 670 F.3d 1221, 1227 (Fed. Cir. 2012) (*"Bywaters II"*). This decision marked the first time the Federal Circuit had interpreted the URA. Accordingly, it is now clear that Federal Circuit law applies.

## B.    Out-of-Forum Rates

In *Bywaters I,* with little discussion, the Eastern District of Texas, applying Federal Circuit law, allowed Washington, D.C. rates over local forum rates despite an objection by the defendant. *Bywaters I*, 2010 WL 3212124 at *2. However, the Federal Circuit concluded on appeal that generally the *forum* rate is applicable under fee-shifting statutes "absent some unusual justification for departing from it." *Bywaters II*, 670 F.3d at 1233. "Such exceptions are permissible only where supported by specific evidence that no local attorneys possess the 'special expertise' necessary to take the case or that no local attorneys were willing to take the case." *Id*. at 1234 and n.10 (citing *McClain v.*

*Lufkin Indus., Inc.*, 649 F.3d 374, 382 (5th Cir. 2011) and collecting cases).  Virtually all circuits follow the general rule that forum rates apply absent unusual circumstances. Therefore, the Court may look to those circuits for guidance.  *See id.*

The Federal Circuit disagreed with the district court that the exception to the forum rule was warranted.  *Id*. at 1234.  It did so because it found conclusory and insufficient "Bywater's declaration indicating that the local attorney that he had originally hired to represent him was unable to help him in a 'complex, specialized area of law' and that the only attorney he could find to represent him 'in the whole country' was his current District of Columbia-based counsel."  *Id.*  More specifically, the Federal Circuit noted that there was no evidence suggesting the unavailability of local attorneys competent to handle the rails-to-trails case and no indication that Bywaters conducted a reasonable search for same.  *Id*.

*Bywaters II* based its decision that the evidence before it was insufficient by citing a Ninth Circuit case, *Schwarz v. Sec'y of Health & Human Servs.*, 73 F.3d 895, 907 (9th Cir. 1995) (denying out-of-forum rates where the only evidence presented came from the plaintiff's own declaration that no forum attorneys were available to handle the case). *Bywaters II*, 670 F.3d  at 1234.  It contrasted *Schwarz* with *McClain* where there was "abundant and uncontradicted evidence" of the need to engage out-of-district counsel. *Id*., n.10 (citing *McClain*, 649 F.3d at 382).  In *McClain*, the records included "numerous affidavits from experienced Texas litigators and even the founder and past president of the Texas Employment Lawyers Association declaring, under oath, that no Texas

attorneys were available to join Garrigan's team on this particular case." *McClain*, 649 F.3d at 378.

Although denying out-of-forum rates in *Schwarz*, the Ninth Circuit allowed them in *Gates* under the generally recognized exception where "local counsel was unavailable, either because they are unwilling or unable to perform because they lack the degree of experience, expertise, or specialization required to handle properly the case." *Gates v. Deukmejian*, 987 F.2d 1392, 1405 (9th Cir. 1992) (collecting cases from other circuits and allowing out-of-forum rates). *See also Barjon v. Dalton*, 132 F.3d 496, 500 (9th Cir. 1997) (recognized exception but denied out-of-forum rates because of insufficient evidence).

The Federal Circuit cited several other cases in addition to *Schwarz* and *McClain*, including *Interfaith Community Organization v. Honeywell Intern., Inc.*, 426 F.3d 694 (3d Cir. 2005). There, the Third Circuit found that the fact that Washington, D.C. counsel had extensive experience litigating similar environmental suits did not lead to the conclusion that other counsel in northern New Jersey did not possess the requisite expertise and that affidavits from five northern New Jersey attorneys who turned down the case was not a sufficient sampling given the "hundreds" of firms in northern New Jersey engaged in the practice of environmental law. However, it did find that there was sufficient justification for the other prong of the exception – that no local counsel was willing to represent the plaintiffs without an immediate advancement of costs that would likely reach $1,000,000. *Id.* at 707. *See also Barjon*, 132 F.3d at 501-02 (finding no

requirement to prove both unwillingness *and* inability due to lack of experience, expertise, or specialization).

Here, the question becomes whether Plaintiffs have submitted sufficient evidence to justify the exception to the forum rule.  Plaintiffs have submitted (1) the declaration of local counsel, Lary Walker, detailing his efforts to obtain Idaho counsel with the requisite knowledge or experience in right-of-way matters generally and rails-to trails takings actions specifically (*Walker Decl.*, Dkt. 259-10) and (2) the declaration of Walter Bithell, a partner at Holland and Hart, a regional law firm with offices in 15 locations most of which are in western United States.[3]  *Bithell Decl.*, Dkt. 259-11.  Mr. Bithell states that he was unaware, both at the time Lary Walker contacted him at the start of the case, and now, of an attorney in the District of Idaho with any expertise in right-of-way and Trails Act issues.  *Id.*  Plaintiffs also submitted the affidavit of Cecilia Fex stating that in 2002, there were only seventeen rails-to-trails takings cases filed nationwide and her firm was handling nine of those cases.  *Fex Decl*. ¶ 12. Dkt. 259-3 and *Pls.' Mem*. at 16.

Although Plaintiffs have obviously submitted more evidence than the plaintiffs did in *Bywaters I*, they submitted less than the plaintiffs in many of the other cited cases.  However, one factor exists here not present in other districts.  The District of Idaho has a far smaller pool of attorneys from which to choose for specialized matters.  At the time

---

[3]  According to Holland and Hart's website, it maintains offices in Aspen, Colorado; Billings, Montana; Boise, Idaho; Boulder, Colorado; Carson City, Nevada; Cheyenne, Wyoming; Colorado Springs, Colorado; Denver Colorado; Denver Tech Center, Greenwood Village, Colorado; Jackson Hole, Wyoming; Las Vegas, Nevada; Reno, Nevada; Salt Lake City, Utah; Santa Fe, New Mexico; and Washington, D.C.  *See*  http://www.hollandhart.com/locations/uniGC.aspx?xpST=OfficeList.

**MEMORANDUM DECISION AND ORDER - 12**

this case was filed in 1999, the entire Idaho State Bar consisted of approximately 2,600 active licensed attorneys.[4] Obviously, not all attorneys engage in a litigation practice.  Of those that do, even fewer engage in a federal court practice.  Unfortunately, the Court does not have District of Idaho statistics available indicating the number of attorneys admitted to the District of Idaho bar in 1999. In any event, members of the relatively small litigation bar are generally well-known to each other.  Thus, the Court feels that it takes less of a showing on either prong of the exception than it would in larger jurisdictions to justify out-of-forum rates.

The Court finds that Plaintiffs have submitted sufficient support for their position that the relevant community for AKF is Washington, D. C.  It further finds that the relevant community for Zelle is Minneapolis except, as discussed below, for hours spent researching Idaho law.  The Court has obviously been involved in this case since 1999 and is quite familiar with the obscure issues surrounding this litigation.  It is convinced that the action could not have been prosecuted successfully but for the specialized expertise of AKF and Zelle that was unavailable among Idaho attorneys.

### C.    Unsuccessful Claims

Defendant next contends that Plaintiffs should not be reimbursed for two areas of work allegedly unrelated to the claims on which they were successful.  First, they object to fees incurred in bringing a motion seeking a ruling pertaining to the $10,000

---

[4]  According to bar admission records maintained by the Idaho State Bar Association, there were 2,639 licensed attorneys on active status in January 9, 1999.

jurisdictional claim limit of the Little Tucker Act.  Second, they object to fees incurred in connection with the deed categories on which they did not prevail.

As the Supreme Court recently stated:

> [I]n the real world, litigation is more complex [than in the movies], involving multiple claims for relief that implicate a mix of legal theories and have different merits.  Some claims succeed; others fail.  Some charges are frivolous; others (even if not ultimately successful) have a reasonable basis.  In short, litigation is messy, and courts must deal with this untidiness in awarding fees.
>
> Given this reality, we have made clear that plaintiffs may receive fees . . . even if they are not victorious on every claim.

*Fox v. Vice*, 131 S.Ct. 2205, 2013-14 (2011) (citing *Hensley*, 461 U.S. at 435).

### (1)   *Ruling Regarding $10,000 Jurisdictional Claim Limit*

Defendant has determined that Plaintiffs expended 113.90 hours pursuing the jurisdictional claim limit issue for a total of $33,401 in fees.  *Response* at 34-35.  Because the Court denied Plaintiffs' motion, Defendant argues that amount should be disallowed. *Id*. at 35.

As stated above, under the Little Tucker Act, "[t]he district courts shall have original jurisdiction, concurrent with the United States Court of Federal Claims, of . . . [a]ny other civil action or claim against the United States, not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress . . . ."  28 U.S.C. § 1346(a)(2).

Plaintiffs sought a determination that a "claim" under the Tucker Act belongs with

the individual asserting just compensation under the Fifth Amendment, not with a parcel of land.  *See Motion*, Dkt. 51 and *Order*, Dkt. 58.  Plaintiffs noted that no court had ever determined whether the claim belongs to the individual or to a parcel of land.  They theorized that the Fifth Amendment protected people rather than parcels of land.  *Pls.' Mem. in Supp. of Mot. re Jurisdictional Limit* at 5.  Dkt. 52.  This argument led to the conclusion that, *e.g.*, Mr. and Mrs. Hash could *each* recover up to $10,000 under the Little Tucker Act.  The Court determined otherwise.  *Order*, Dkt. 58.

The Court finds that attorney fees attributable to the jurisdictional limit issue are allowable.  There was an arguable basis for the motion given that the issue was not entirely clear.  It needed to be resolved as a question of law before class notices could be mailed.  It was not a claim in and of itself.  Rather, it was ancillary to the claim of illegal taking.

### (2)    *Determinations on Categories 4, 5, 6, 7, 8, and 9*

Defendant contends that because title and liability issues were resolved in its favor on deed Categories 4, 5, 6, 7, 8, and 9, Plaintiffs were not prevailing parties on those categories and should not be awarded fees for work pertaining to those categories.  *Response* at 35-56.  With respect to Categories 4, 7, and 9, Plaintiffs agreed that the deeds conveyed fee simple title to the railroad, the Court entered judgment in favor of Defendant, and Plaintiffs did not appeal.  *Id*.  With respect to Categories 5, 6, and 8, the Court found both initially and on remand that the deeds conveyed fee simple title to the railroad.  *Id*.

According to Defendant, the claims in the six "unsuccessful" categories comprise 31.3% of the total lands at issue. Therefore, relying on the directive in *Hensley* that hours spent on unsuccessful claims should be excluded when determining a reasonable fee, Defendant suggests reducing the claimed fees by 30% or $711,120 to account for the unsuccessful claims. *Id.* (citing *Hensley*, 461 U.S. at 440). Plaintiffs argue that Defendant misinterprets the meaning of claim in the URA and that there was actually only one claim in the Amended Complaint.

The Amended Complaint was brought by "all persons who own an interest in land constituting part of the railroad corridor . . . now occupied or controlled for trail use by the Friends of the Weiser Trail . . . ." *Am. Compl.* ¶ 23. However, Plaintiffs recognized in the Amended Complaint itself that common questions of law existed such as "whether . . . the railroad obtained an interest in fee simple or an easement in the parcels constituting the rights-of-way subject to the Trail Use Orders" that needed to be resolved before liability could be determined. *Am. Compl.* ¶ 27(a).

The Court agrees that there was only one claim alleged in the Amended Complaint. The issues surrounding the various deed categories were simply that – issues that needed to be resolved when addressing the one claim.

Plaintiffs engaged in discovery and reviewed deeds to determine who was eligible for compensation. Plaintiffs did not argue that the Category 4, 7, and 9 parcels had valid claims once discovery showed otherwise. Furthermore, even though the Court found against Plaintiffs by determining that the deeds in Categories 5, 6, and 8 conveyed fee

title to the railroad, the landowners in those categories will receive damages under the Settlement Agreement in the amount of 20 to 30% of their claims. Therefore, they were successful to the extent they recovered, in the Court's view, not an insignificant amount of damages. *See In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000) (finding that a settlement of one-sixth of the potential recovery was "fair and adequate" given difficulties in proving case). Final judgment was not entered on the claims in these categories. Those Plaintiffs affected could have requested entry of judgment and appealed the Court's ruling incurring even more attorneys' fees. *See Joint Mot. for Final Approval of Class Action Settlement* at 14-15, Dkt. 251 (noting potential for appeal by Plaintiffs based on conflicting decisions regarding these categories and likelihood of continuing to litigate the question of liability on Categories 1, 5, 6, and 8). The foregoing of the appeal in return for the settlement indicates "success" for the present purposes.

Even if the adverse rulings on certain categories were deemed to have been unsuccessful on "claims," Plaintiffs would still be entitled to attorneys' fees. The rationale of *Buckhannon* finding that a party who enters a settlement agreement can be a prevailing party is somewhat analogous to plaintiffs within a class. The Supreme Court has examined what constitutes a "prevailing party" under a fee-shifting statute where a plaintiff settles rather than proceeding to a determination on the merits. The Court determined that a settling party is a prevailing party when there is a court-ordered consent decree creating "a material alteration of the legal relationship of the parties." *Buckhannon Board and Care Home, Inc. v. West Virginia Department of Health and*

*Human Resources*, 532 U.S. 598, 604 (2001) (construing the attorneys' fees provisions in the Federal Housing Amendments Act ("FHAA") and the Americans With Disabilities Act ("ADA")).  A court-ordered consent decree provides a "judicial imprimatur" of the settlement.  *Id.*

The parties' Settlement Agreement has a "judicial imprimatur" given that the agreement would not have become binding on class members unless the Court had given it final approval at the fairness hearing held pursuant to Fed. R. Civ. P. 23(e) on September 7, 2011.  *See Hutchinson ex rel. Julien v. Patrick*, 636 F.3d 1, 10 (1st Cir. 2011) (finding approval under Rule 23 constituted judicial imprimatur where court "engaged in a sufficient appraisal of the merits for purposes of the imprimatur requirement" by holding multiple hearings and displaying familiarity with the terms of the Agreement). Here, the Court was thoroughly familiar with the issues through the years of litigation and carefully reviewed the settlement agreement before the fairness hearing.

The Court finds that Defendant's contention that Plaintiffs' request for attorneys' fees should be reduced on the grounds that there were claims on which they were not successful lacks merit.

### D.    Work Performed for Other Clients

Defendant objects to the request for fees totaling $3,154.50 (16.40 hours) for work performed for several clients identified in the billing records who opted out of this case or were not involved as either named plaintiffs or class members. *Response* at 33, Ex. 13.

However, the Court notes that Exhibit 13 lists a total of 22.70 hours and $3,362.70 in fees.  The Court is uncertain of the reason for the discrepancy.  However, it appears that the figures in Defendant's Exhibit 13 are the correct figures. In any event, the Court agrees that work for clients who opted out of the case or were not involved is not allowable.  The plain language of the URA provides for reimbursement of plaintiffs only.

Plaintiffs likewise concur and withdraw their claim regarding all except Kerner ($66 (.4 hours)) because he "appears" to be a class member pending further review by the parties and Mink ($990 (6 hours)) because Mink is a class member.  *Reply* at 19. Plaintiffs therefore reduce their claim by $2,306.70 (16.30 hours).  *See Response*, Ex. 13 and *Reply*, Ex. G at 2.  The amount billed for Kerner is relatively *de minimis*.  The Court will err on the side of the assumption that Kerner is a class member and will not reduce the award by the disputed $66.  Accordingly, the Court will reduce the attorneys' fees claim by the conceded $2,306.70 only.

### E.    Administrative and Clerical Tasks

Defendant objects to fees claimed for clerical and administrative tasks performed by paralegals and attorneys.  *Response* at 33-34.  The Supreme Court has excluded recovery for such tasks at a paralegal rate and impliedly at an attorney rate as well.  *See Missouri v. Jenkins*, 491 U.S. 274, 288-89 n.10 (1989).  *See also Preseault v. United States*, 52 Fed. Cl. at 681 (same as to attorney rate).  Defendant identified four entries for such tasks, the total value of which is $275.30.

Although observing that the paralegal entries "may have been too simplistically

written rather than inappropriately billed," Plaintiffs have conceded not only the

challenged entries but also some additional entries for a total of $510.10 (1.70 hours) for

entries appearing to relate to clerical or administrative matters.  *See Reply*, Ex. G at 3.

*See also In re Enron Corp. Sec, Derivative & ERISA Litig*., 586 F. Supp. 2d 732, 808

(S.D. Tex. 2008). Therefore, the Court will reduce Plaintiffs' attorneys' fees claim by the

conceded and withdrawn items totaling $510.10.

## F.    Class Representatives' Fee Agreement with Counsel

Defendant claims that it is appropriate under Rule 23(h) and Supreme Court case

law for the Court to consider any fee-related agreement between Plaintiffs or Class

Representatives and their counsel.  *Response* at 12.  Because no written fee agreement

exists with class counsel in this case, Defendant suggests reference to two fee agreements

in the *Swisher* case in which the original Plaintiffs initially participated.  *Id*. at 13.

Defendant also contends that the plain language of the URA only allows fees and costs

"actually incurred."

Because Plaintiffs have no written fee agreement or any other evidence to show

that they have "actually incurred" and paid for, or are contractually obligated to pay for

any fees and costs in relation to this case, Defendant's argument carried to its logical

conclusion is that Plaintiffs are not entitled to recovery at all.  However, Defendant does

recognize in a footnote a holding that "a plaintiff who has obtained representation on the

condition that he seeks fees for his attorneys has incurred an obligation that can be

reimbursed by a fee-shifting statute."  *Response* at 13 n.10 (citing *Preseault*, 52 Fed. Cl.

at 674).

Relying on the fee agreements in the *Swisher* case, Defendant appears to argue that Plaintiffs are limited to a one-third contingency award or $378,833. *Response* at 14. However, as noted by Plaintiffs, the fee agreement in *Swisher* provided that the fee shall be the *greater* of the value of services based on regular hourly rates *or* one third of the amount recovered. *Reply* at 8.

Plaintiffs have now introduced two affidavits as evidence of an oral agreement between the parties. Lary Walker states that he consistently told his clients when asked that if the class action was successful, the Government would pay the attorney fees. *Reply*, Ex. I (Walker Decl.). Nancy Hawkins, one of the named Plaintiffs, stated that when the case began, Lary Walker told her that she would not be responsible for paying attorneys' fees and costs and that he would seek them from the Government if they prevailed. *Reply*, Ex. J, ¶ 2 (Hawkins Decl.). She also spoke with Cecilia Fex a few years later who confirmed the arrangement. *Id*., ¶ 3.

The Court recognizes that the commentary to Fed. R. Civ. P. 23(h) states, and the Supreme Court and the Ninth Circuit have in the past held, that a fee agreement is a factor to consider when determining a reasonable fee. *See Fed. R. Civ. P. 23*, subdivision (h), advisory comm. notes (2003 Amends); *Pennsylvania v. Del. Valley Citizens' Council for Clean Air*, 483 U.S. 711, 723 (1987); *Blanchard v. Bergeron*, 489 U.S. 87, 92-93 (1989); *United States v. $186,416 in U.S. Currency*, 642 F.3d 753, 755 (9th Cir. 2011). However, the Court is not aware of any authority holding that a written fee agreement is a

prerequisite to recovering fees and costs under the URA.  To the contrary, fees may be awarded where there is an express or implied agreement that any fee award will be paid over to counsel.  *Preseault*, 52 Fed. Cl. at 676.

Plaintiffs' supporting affidavits reveal an agreement that attorneys' fees would be sought from Defendant and paid to counsel.  Fees are considered "actually incurred" by reason of an express agreement under which the plaintiffs agree to pay any attorneys fees recovered in the litigation to their attorneys.  *Id*. at 677.  The fact that these fees are not paid or owed by the litigant, but rather are born (sic) initially by a third party . . . does not prevent recovery of those fees under the URA."  *Id*.  Furthermore, the lodestar approach has predominated since *Hensley* and provides a more accurate objective determination of a reasonable fee than a fee agreement does.  *Perdue*, 130 S.Ct. at 1672.  Accordingly, the fact that there is no written fee agreement in this case does not affect the Court's determination of what is a reasonable attorneys' fee.

## 2. Lodestar Approach

As stated above, in determining a reasonable attorneys' fee, the Court must begin with the "lodestar" figure which is "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley*, 461 U.S. at 433.  The lodestar figure is "[t]he lynchpin to calculation of a fee under the URA." *Moore v. United States*, 63 Fed. Cl. 781, 785 (Fed. Cl. 2005).

Having ruled on Defendant's more general objections, the Court will now review the reasonableness of the number of hours expended on the litigation and the hourly rate

charged.  In doing so, the Court is mindful of the fact that this litigation has occurred over a period of thirteen years and involved, as characterized by Plaintiffs, numerous issues in an uncertain and emerging area of law that was contrary to precedent and that included an intervening appeal.  The Court is also mindful of the fact that Plaintiffs incurred 6,790 hours in the liability phase, yet only 520 hours in the damages/settlement phase of the litigation, a factor that generally favors a party requesting attorneys' fees.

## A. Hours Expended

Plaintiffs cite to other takings cases in which courts approved hours equal to an average of 500 to 1,000 hours per year.  *See Moore*, 63 Fed. Cl. at 787-89 (6,000 hours during twelve years of litigation); *Branning v. United States*, 7 Cl. Ct. 777, 780-81 (1985) (approximately 5,000 hours in nine years); *Fla. Rock Indus., Inc. v. United States*, 9 Cl. Ct. 285, 288-89 (1985) (more than 3,000 in three years).  In contrast, Plaintiffs' 7,300 hours in thirteen years equates to approximately 609 hours per year (750 hours per year before liability was established and 170 per year thereafter).  *Reply* at 2.

In determining a reasonable number of hours expended, the Court must exclude hours that are "excessive, redundant, or otherwise unnecessary."  *Hensley*, 461 U.S. at 434.  Plaintiffs claim that they have already exercised billing judgment and removed such hours.  *Pls.' Mem.* at 13 and n.13 (Plaintiffs have reduced their hours by 367.51) (citing *Fex Decl.* ¶ 10 and Ex. 1 thereto).

### (1) Duplicative Hours

Defendant's primary complaint about the number of hours charged by Plaintiffs is

the duplication of effort reflected in entries by multiple attorneys from three firms (1) receiving, reviewing, analyzing, and commenting on papers prepared by counsel of record for court filings and court decisions, and (2) engaging in conferences. *Response* at 31-32. Defendant recognizes that Plaintiffs are entitled to engage multiple attorneys or firms yet cite Court of Claims cases holding that taxpayers ought not have to pay for the added representation. *Id.* at 29-31 (citing *Emeny v. United States*, 526 F.2d 1121, 1126 (Ct. Cl. 1975); *Branning*, 7 Ct. Cl. at 779-80; and *Preseault*, 52 Fed. Cl. at 680-81.

Defendant also observes that Plaintiffs' hours are "strikingly high" when compared with Defendant's counsel's hours over the same time period. Department of Justice attorneys and paralegals reported 2,980.25 hours for the same time period. *Response* at 31.

Plaintiffs respond that it is commonplace to collaborate with co-counsel. They stress that there was "value added" from the collaboration and not mere "layering on timekeepers when none [were] needed." *Reply* at 19.

Plaintiffs also emphasize that each firm and attorney had a specific role working together as a cohesive unit. *Reply* at 20. AKF was lead counsel, devising strategy, researching and drafting litigation documents, and providing coordination among the three firms. WLO, in addition to serving as local counsel, was also responsible for tasks requiring a presence in Idaho such as researching deeds at county recorders' offices. Zelle assisted when briefing schedules were demanding and their background in railroad property interest law would be beneficial. *Id.*

Finally, Plaintiffs counter that Defendant is targeting *all* attorney hours in a day's entry and not just the allegedly duplicative hours which would be substantially less. *Reply* at 20 n.23.  The Court agrees that deducting the whole entry is not appropriate.

Courts should "examine with skepticism claims that several lawyers were needed to perform a task, and should deny compensation for such needless duplication as when three lawyers appear for a hearing when one would do."  *Democratic Party of Washington State v. Reed*, 388 F.3d 1281, 1286-87 (9th Cir. 2004) (citations omitted) (emphasis added).  However,  "[p]articipation of more than one attorney does not necessarily amount to unnecessary duplication of effort."  *Id*.

The Court has examined the challenged entries with the requisite skepticism and concludes there is some merit to Defendant's claim yet also some merit to Plaintiffs' challenge to Defendant's computation.

Plaintiffs have prepared a table listing each challenged entry related to document review and a table related to conferences.  *See Reply*, Exhibit L.  The tables isolate the portion of each entry attributable solely to the review or conference.  Targeting just the allegedly duplicative review hours and removing them from the challenged document review hours reduces those hours from 18.90 to 11.90 hours, resulting in 7 arguably duplicative hours.  *Id*., Ex. L at 4.   Removing them from the challenged conference hours reduces those hours from 90.90 to 72 hours.  *Id*., Ex. L at 3.  In other words, of the 90.90 conference hours, only 18.90 hours are arguably duplicative.

As the court observed in *Preseault*, "the costs of having one set of experienced,

competent, and highly paid attorneys review the work of another set of experience,

competent, and highly paid attorneys is not reasonable." *Preseault*, 52 Fed. Cl. at 680.

However, as also noted by the court in *Preseault*, it did "not lightly second-guess

plaintiffs' determination of what costs are reasonable" because plaintiffs have no

assurance that they will prevail and recover attorneys' fees and are therefore unlikely to

overbill. *Id.*

Unlike the plaintiffs in *Preseault* whose post-liability determination attorneys' fees

(*i.e.*, fees incurred after recovery under the URA was triggered) were over half of the total

fees, here, a mere 520 hours of post-liability determination fees are claimed out of a total

of approximately 7,300 hours. *Pls.' Mem.* at 11.

That the vast majority of the hours claimed were incurred prior to the liability

determination strongly suggests that Plaintiffs' counsel "exercise[d] control over the time

spent and the rates charged." *Preseault*, 52 Fed. Cl. at 680 (citation omitted). On the

other hand, having a third firm involved obviously increased the incidence of tasks such

as conferring, reviewing, and the like. However, it also likely resulted in research being

performed at a lower hourly rate than AKF would have charged.

It is difficult to quantify whether engaging the services of a third firm was

reasonable in the long run or resulted in unnecessary duplication of effort. AKF, in an

attempt to submit a reasonable claim for Zelle's services on easement and adverse

possession issues, reduced the Zelle 2007 billings by one-third or 142.57 hours. *Pls.'*

*Mem.*, *Fex Decl.* ¶ 10, Ex. A.

**MEMORANDUM DECISION AND ORDER - 26**

The Court realizes that a fair amount of duplication is inherent in complex litigation involving several attorneys –  even within one law firm.  Each attorney involved must keep abreast of developments in other areas.  The Court would be more concerned here but for the fact that AKF already eliminated one-third of Zelle's hours and had identified several more hours that may be duplicative.

The Court will reduce Plaintiffs' claim by the 25.90 hours that it suggests, but does not admit, may reflect duplication of effort in conference and document review entries.  By the Court's calculation based on the figures in Exhibit L, the total amount represented by those 25.90 hours is $7,646.80 ($5,981.80 for conferences and $1,665 for review).  The Court will reduce the requested award by that amount.

### (2)   *Excessive Hours*

#### (a)   *Hearing Preparation Excluding Moot  Court*

Defendant next challenges the number of hours spent preparing for oral arguments.  In particular, Defendant challenges the over 200 hours spent post-briefing through summary judgment argument (7/16/2001 through 8/8/2001) totaling $71,673 and the 265.80 hours preparing for argument before the Federal Circuit (3/9/2004 through 4/5/2004) totaling $107,927.  *Response* at 32 and Ex. 12.  Defendant finds these hours excessive in comparison with the concededly reasonable 34.5 hours Plaintiffs' counsel spent preparing for the January 2008 summary judgment hearing.  *Id*. at 33.  In separate but related issues, Defendant objects to the number of hours incurred with moot court preparation and related to amicus filings.

Plaintiffs argue that they bore the burden of proof in convincing the Court to reverse many of the liability determinations, that there were numerous state and federal issues, and that they needed to convince the Court to hold contrary to *Oregon Short Line* and its progeny.  *Reply* at 21.  Further, they point out that by the time of the summary judgment hearing in 2008, they were more experienced and a liability judgment was "within reach."  *Id.*  Nevertheless, the contrast with the time spent preparing for the 2001 and 2004 arguments is dramatic especially given that most of the research should have already occurred by the time Plaintiffs filed the briefs for the respective hearings.

A review of the entries for hearing preparation reveals numerous entries for "research" and "further research."  Notably, most of the 2001 entries for Cecilia Fex simply state "continued preparations for hearing" making it difficult to know exactly what the preparations entailed.  Likewise, most of the 2004 entries for Cecilia Fex simply state "continued preparing for Oral Argument" and included entries for preparing for moot court argument prior to the argument before the Federal Circuit.  Again, it is difficult to know what work was performed.

The Court notes that Ms. Fex was extremely well prepared in her arguments before this Court and exhibited a thorough knowledge of this case, case law from other courts, and developments in other then pending rails-to-trails cases.  However, Defendant's counsel was likewise well prepared having spent far fewer hours and engaging the assistance of far fewer attorneys and paralegals.

In *Nadarajah v. Holder*, 569 F.3d 906 (9th Cir. 2009), the Ninth Circuit in

granting an award of attorney fees pursuant to the Equal Access to Justice Act (EAJA) allowed over the government's objection an alien attorney's claim of 40 hours for preparation for oral argument before the Court of Appeal.  The government claimed the hours were excessive because the attorney had already spent 40 hours briefing the appeal.  The court found the post-briefing hours reasonable under *Hensley* because it "was a significant case because of its importance to Nadarajah, who had been detained for more than four years, and its impact on the law regarding indefinite detention.  The case also was complex, presenting unique statutory and constitutional questions that required a 58-page brief, warranted an amicus curiae brief, and resulted in a 15-page opinion."[5]
*Nadarajah*, 569 F.3d at 924.

> *Nadarajah* contains other guidance as well, albeit in the civil rights context:

>> The government apparently contends that the case was overstaffed, or objects to as unnecessary Arulanantham's conferencing with two other attorneys, consultation with amicus curiae, and, while the habeas corpus petition was pending, continuing to research and develop certain issues.  This court recently addressed whether a civil rights attorney's time was unnecessary:

>>> Lawyers are not likely to spend unnecessary time on contingency fee cases in the hope of inflating their fees. The payoff is too uncertain, as to the result and the amount of the fee. It would therefore be the highly atypical civil rights case where plaintiff's lawyer engages in

---

[5]  The alien's attorney had "reviewed the voluminous record, researched the opinions of the panel judges, organized two moot court arguments with experienced ACLU and outside counsel, and researched several unbriefed issues, one of which arose at argument."  *Nadarajah*, 569 F.3d at 924.  Counsel did not request fees for outside counsel who assisted in oral argument preparation.  *Id.*

> churning. By and large, the court should defer to
> the winning lawyer's professional judgment as
> to how much time he was required to spend on
> the case; after all, he won, and might not have,
> had he been more of a slacker.

*Nadarajah*, 569 F.3d at 924 (citing *Moreno [v. City of Sacramento]*, 534 F.3d [1106] at

1112 [9th Cir. 2008]) (finding the contested hours reasonable).

Here, like *Nadarajah*, the case was unique and the issues complex and required

extensive briefing and no doubt required extensive preparation for hearing.  On balance,

however, the Court finds the number of hours for hearing preparation quite excessive.

AKF's and Zelle's 200 hours expended in preparing for oral argument in 2001, assuming

a five-day work week, and an eight-hour work day, amounts to essentially one attorney

spending five straight weeks of preparation for a 30-minute oral argument.  Their time in

2004 of 265.80 hours would have equaled over six weeks.   Accordingly, the Court will

reduce these fees by 40%.  *See Fox v. Vice*, 131 S.Ct. 2205, 2216 (2011) ( stating trial

courts may consider "their overall sense of a suit, and may use estimates in calculating

and allocating an attorney's time").  More specifically, the Court will reduce the fees for

preparing for the 2001 hearing by $28,669.20 and for preparing for the 2004 hearing by

$43,170.80.

### (2)    *Moot Court Preparation*

The court in *Reed* addressed moot court preparation and found that "[a] moot court

to prepare for argument in a case as important as this one is not unreasonable."  *Reed*, 388

F.3d at 1286-87.  Similarly, the Third Circuit found that "time spent rehearsing oral

advocacy, *i.e.*, 'moot court,' may be compensated as long as the time requested is not

excessive."  *Maldonado v. Houstoun*, 256 F.3d 181, 187 (3d Cir. 2001).  The court

cautioned, however, that:

> A reasonable fee for hours spent preparing for a legal
> argument should be limited to hours reasonably necessary for
> a lawyer to become familiarized with the facts and the law
> pertaining to the issue to be argued, an analysis of the
> opponent's argument, and questions anticipated to be posed
> by the court. Under the fee shifting statute, the losing party is
> expected to pay for hours reasonably spent in the argument
> and its preparation, *but not for excessive hours, or hours spent
> in learning or excessively rehearsing appellate advocacy*.

*Id*. (emphasis added).

A year later, the Third Circuit found a claim of 25.5 hours of moot court

preparation to be excessive under *Maldonado*.  It noted,

> Even assuming that an oral argument is 30 minutes per side,
> 25.5 hours would enable a lawyer to practice his argument
> over 50 times.  We assume that litigators have a baseline
> competency in oral advocacy that does not require such
> extensive rehearsal at the possible expense of an opposing
> litigant.

*Planned Parenthood of Cent. New Jersey v. Attorney General of the State of New Jersey*,

297 F.3d 253, 269 (3rd Cir. 2002) (remanding for a determination of the reasonable

number of hours).

Several district courts have allowed fees for moot court preparation as long as the

hours are reasonable.  *See*, *e.g., Trainor v. HEI Hospitality LLC*, 2012 WL 119597 at *10,

(D. Mass. Jan. 13, 2012); *American Civil Liberties Union of Kentucky v. McCreary*

*County, Kentucky*, 2009 WL 720904 (E.D. Ky. 2009) (finding moot courts were a "vital component" of preparation for Supreme Court argument).  However, others have disallowed the fees.  *See, e.g., Flying J Inc. v. Comdata Network, Inc.*, 2007 WL 3550342 (D. Utah Nov. 15, 2007) (collecting cases) (finding that the expense of using third-party consultant for moot court rehearsals "should normally be borne as part of the overhead expense component of counsel's standard billable hourly rate").[6]

On balance, after considering the uniqueness of the issues and the uncertainty of the law, the Court finds that moot court preparation was warranted but that the total hours claimed is somewhat excessive.  However, any excessiveness  in moot court preparation

---

[6]  The court in *Flying J* surveyed case law from other federal district courts regarding moot court rehearsals and found to be "context-driven, with mixed results. *See Moon v. Gab Kwon*, 2002 WL 31512816, at *6 (S.D.N.Y.2002) (observing that "law firms often use mooting to prepare even the most experienced litigators for trials and oral arguments, and would be ill-advised to allow their attorneys to 'perform' in court unrehearsed; indeed, lawyers have been known to rehearse entire trials before mock juries, for similar reasons. Such time is appropriately billed to clients"); *Diamond Shamrock Exploration Co. v. Hodel*, 1991 WL 148745 (E.D.La.1991) (finding 162 hours of preparation for district court oral argument, including conferences "research, reviewing briefs and other materials, outlining arguments, rehearsal, observation of the appellate panel, and attendance at oral argument," and 1,398 hours expended during the appellate phase to be excessive); *Baird v. Bellotti*, 616 F.Supp. 6, 8 (D.Mass.1984) ("Preparation for oral argument required not only review of the briefs of all parties and the authorities cited therein, but review of other relevant, even tangentially relevant, authority, as well as thinking about and rehearsing the oral presentation."); *P.N. v. Clementon Bd. of Educ.*, 2007 WL 1186552, at *12 (D.N.J.2007) (ruling that five hours billed by two lawyers "in connection with the moot court excessive in light of the limited issues on appeal"); *Majestic Box Co., Inc. v. Reliance Ins. Co. of Ill.*, 1998 WL 720463, at *5 (E.D.Pa.1998) (finding that "the complicated nature of the defense required in this litigation justifies defendant's expenditures on the 'mock trial' "); *O'Sullivan v. City of Chicago*, 484 F.Supp.2d 829, 837 (N.D.Ill.2007) ("The claims in this case were not so complex-indeed they were not complex at all-that an expenditure of over $14,000.00 in fees ... for a mock trial can be deemed compensable."); *Akron Center for Reproductive Health v. City of Akron*, 604 F.Supp. 1275, 1288 (N.D.Ohio 1985) (finding that the nearly 1,900 attorney hours expended on Supreme Court appeal, including "a series of moot court arguments as a part of the preparation for the oral argument before the Supreme Court," was excessive and reducing the claimed amount by 30%); *Ragsdale v. Lumpkin*, 94 F.3d 647 (Table), 1996 WL 449201, *6 (7th Cir.1996) (ruling that four attorneys participating in two moot arguments in preparing for appeal hearing was not excessive)."  *Flying J*, 2007 WL 3550342 at *22.

will be remedied in the 40% reduction in hours attributed to hearing preparation for the 2004 hearing.

### (3)    Amicus Briefs

Defendant objects to the $35,728 (more precisely, $35,727.90) (87.90 hours) charged (1) for conferring with entities regarding the filing of amicus curiae briefs in this case, (2) for additional researching and drafting an amicus curiae brief to be filed in *Ellamae Phillips Co. v. United States*, No. 04-1544 (Fed. Cl.) ("*Phillips*"), and (3) for assisting counsel of record in that case with his strategy, briefing, and oral argument. *Response* at 36-37.  Without citing any case law, Defendant claims that the fees for this work were not incurred "because of" the proceedings in this case within the meaning of the URA.  Defendant does not object to the number of hours expended.  Rather, it objects to the inclusion of *any* fees related to the amicus briefs in this case and in *Phillips*.

### (a)    Amicus Briefs filed in this Case

Defendant's Exhibit 15 lists six entries from 2000 and 2003 for reviewing or conferring about amicus briefs filed or to be filed in this case totaling 13.4 hours for a total charge of $5,211.20.  Dkt. 262-5.  Plaintiffs did not address the objection to the hours pertaining to amicus briefs filed in this case in their Reply.

The Court notes that the Idaho Farm Bureau Federation filed and amicus brief (Dkt. 30) in support of class certification in 2000 and Rails-to-Trails Conservancy filed an amicus brief (Dkt. 157) in support of Defendant's motion for summary judgment in 2006. Since none of the disputed entries occur in 2006, the Court assumes that the 2003 entries

refer to Rails-to-Trails' filing of an amicus brief in the Federal Circuit appeal in 2003.

*See Brief of Amicus Curiae Rails-to-Trails Conservancy in Support of Defendant-Appellee United States for Affirmance of the Decision Below (Corrected) (Nov. 17, 2003)*, 2003 WL 25291553.

In reviewing the four challenged entries for 2000, the Court notes that the time entries included other items not involving amicus briefs.  For example, Nels Ackerson's entry of 1/31/2000 states "Ackerson worked on materials and drafts prepared by Cohen; drafted sections of final brief [5.7]; reviewed amicus brief by Farm Bureau [0.5]."  It is apparent that the amount attributable to the amicus brief was only .5 hours or $222.  Cohen was a member of AKF.  The Ackerson entry for 1/19/2000 stated "Ackerson received and reviewed U.S. brief; worked on strategy for efficient response; placed telephone call to D. Welsh; received copy of Moore decision; received report on Cattle Assoc intended amicus."  Clearly, receiving the report on the intended amicus was only a small part of the 2.20 hours charged in that entry. Judging from Ackerson's 1/31/2000 entry, the Court would estimate that receiving the report would have likewise been .5 hours or $222.  The remaining two entries from 2000 total .70 ($310.80) and 1.50 ($159) hours, respectively, and each involves at least one item not pertaining to the amicus. However, even if all of the time for those two entries had been amicus-related, the resulting total attributable to the 2000 amicus entries would be 3.20 hours or $913.80. The two entries for 2003 total 2.8 hours or $1,041.80.

The Court finds that the time spent conferring about or reviewing the amicus briefs

in support of their position in this case was "because of" this case and is reasonable and *de minimis* in the context of this entire litigation.[7]

### (b)      *Amicus Brief filed in Phillips*

The D. C. Circuit implicitly approved recovery of fees incurred in preparing an amicus brief in a related case by remanding to the district court for reconsideration of "the reasonableness of the time spent on the amicus brief" noting that "[c]ompensable time should not be limited to hours expended within the four corners of the litigation." *Nat'l Ass'n of Concerned Veterans v. Secretary of Defense*, 675 F.2d 1319, 1335 (D.C. Cir. 1982).  The court cautioned, however, that "there must be a clear showing that the time was expended in pursuit of a successful resolution of the case in which the fees are being claimed." *Id. See also Boehner v. McDermott*, 541 F. Supp.2d 310, 319 (D.D.C. 2008) (finding fees incurred for amicus brief allowable because "the time was expended in pursuit of a successful resolution of the case" and "would have been undertaken by a reasonable and prudent lawyer to advance or protect his client's interest 'in this case.'")

The Court notes that Defendant was successful before the district court on the argument in *Bywaters I* that the plaintiffs in that case should not recover fees for an amicus brief filed in another case.  There, without discussion, the court found the 18.2 hours spent drafting and filing an amicus brief were unreasonable within the meaning of

---

[7]  In its review of the billing records, the Court noted three other entries pertaining to amicus briefs:  Ackerson's entries of 1/9/2000 and 1/11/2000 regarding Idaho Farm Bureau (Pls.' Ex. 1 at 7) totaling one hour, and Baarda's entry of 2/9/2000 (Pls.' Ex. 1 at 9) totaling 1.2 hours, some of which was attributable to other matters.  Again, the Court finds these charges insignificant.

the URA.  *Bywaters I* at *3.  Plaintiffs did not appeal the issue.

*Bywaters I* is not dispositive of the issue here, however, because there "Plaintiffs failed to offer any reasoned rebuttal to the United States' challenge. . . ."  *Id.* (reducing the fee petition by the 18.2 hours expended in connection with the amicus brief).

It is difficult for the Court to determine whether Defendant's compilation of entries attributable to the *Phillips* amicus work  (Ex. 15) is accurate.  However, Plaintiffs do not dispute it in their Reply, so the Court will assume it is accurate.  They argue only that it would have been imprudent not to have participated as amicus in *Phillips* given Defendant's attempt to use the *Phillips* case "to unravel the liability determination concerning the 1875 Act" in this case.  *Reply* at 22.

In this case, the Federal Circuit had determined in 2005 that the Government was liable to the Category 1 landowners and remanded to this Court for a determination of damages.  *Hash v. United States (Hash II)*, 403 F.3d 1308 (Fed. Cir. 2005).  On February 1, 2007, this Court rejected Defendant's argument that *Hash II* directed the Court to first determine the issue of liability.  *Mem. Dec. and Order*, Dkt. 176.  On July 3, 2007, the Federal Claims court in *Phillips* agreed with this Court that *Hash II* had decided the issue of liability and granted the plaintiffs' motion for summary judgment.  *Ellamae Phillips Co. v. U.S.*, 77 Fed. Cl. 387 (Fed. Cl. 2007).  Defendant appealed contending that *Hash II* could not be reasonably read to hold the United States liable for a taking and that even if it did, *Hash II* was not dispositive of liability in other cases.  Plaintiffs' counsel in this case then filed an amicus brief in the appeal supportive of *Phillips* and *Hash II*.  On

appeal, the Federal Circuit confirmed that it had indeed determined the liability issue on

the Category I deeds in *Hash II*.  *Ellamae Phillips v. United States*, 564 F.3d 1367, 1372

(Fed. Cir. 2009).

Defendant argues essentially that the chronology of the decisions is evidence that

filing an amicus brief in *Phillips* was not necessary to Plaintiffs' claims in this case since

the Court had already issued its decision.  *Response* at 37.   Plaintiffs counter stating that

if the *Phillips* court on appeal agreed with the United States, the parties would have been

required to re-brief liability in this case starting after May of 2009 rather than pursuing

settlement on damages.  *Reply* at 22.

Given that final judgment had not yet been entered on the Court's 2005 decision,

Plaintiffs are correct that an adverse decision to the plaintiffs on appeal in *Phillips* would

have triggered reopening of the liability issue in this case.  Therefore, the Court finds that

it was reasonable to bolster its position in *Phillips* and that the time expended in preparing

the amicus brief was incurred "because of" the proceedings in this case within the

meaning of the URA.  However, the total amount of $30,516.70 ($35,727.90 less the

$5,211.20 applicable to entries regarding amicus briefs in this case) attributable is not

reasonable.

The Court finds that the time expended in assisting *Phillips* counsel with oral

argument goes beyond what can reasonably be found to have been incurred "because of"

the *Hash* proceeding.  Therefore, the Court will not allow the fees totaling $1,838.10 for

the entries of 1/30/2009, 2/1/2009, 2/2/2009, and 2/3/2009.  *See Def.'s* Exhibit 15 at p. 15.

Furthermore, because of the difficulty in determining whether there is any overlap in the numerous entries of "continued drafting brief" or "working on brief" of Cecilia Fex and Yang Ge, the Court will reduce the remaining amount claimed for the amicus brief, $28,778.60, by 15% or $4,316.79.  Therefore, the Court will deduct from the requested award for work pertaining to the *Phillips* amicus brief the sum of $6,154.89 ($4,316.79 plus $1,838.10).

**B.    Reasonable Rate**

Plaintiffs seek out-of-forum rates for AKF and Zelle and contend that those rates should be based on the "Updated Laffey Matrix" for AKF's rates and on billing surveys, case law, and attorney declarations for Zelle and WLO.  The Court determined above that AKF and Zelle are entitled to rates based on their respective forums except for research on Idaho law issues by Zelle.

*(1)    WLO – Idaho Rates*

Plaintiffs request hourly rates for Lary Walker ranging from $165 in October of 1998 to $225 in July of 2011 and for Delton Walker from $125 in October of 1998 to $200 in June of 2011.  *See Fex. Decl.*, Ex. 1 at 1 and 89, Dkt. 259-4.  The reasonableness of the fees is supported by the Declaration of Walter H. Bithell who found the rates to be "well within the typical range of rates charged by attorneys and paralegals in Boise for similarly complex litigation over that time period."  *Bithell Aff.*, ¶ 4, Dkt. 259-11.

Defendant cites the Idaho Attorney General's Policy on Recovery of Attorney Fees

and Costs and the Idaho State Bar Membership Surveys as evidence that WLO's rates are "somewhat higher than other indicators of market rates." *Resp.* at 24.  However, Defendant "agrees for the purposes of this litigation that the hourly rates for WLO . . . appear to be within the range of hourly rates that would be considered reasonable for the District of Idaho." *Id.*

Based on the above and the Court's general familiarity with rates charged by attorneys during the relevant time period within the District of Idaho, the Court finds that the historical rates charged by WLO are reasonable.  *See Ingram v. Oroudijan*, 647 F.3d 925, 928 (9th Cir. 2011) (finding district court had not abused its discretion by relying in part on its own knowledge and experience regarding customary rates in the legal market). *See also Norman v. Housing Authority of City of Montgomery*, 836 F.2d 1292, 1303 (11th Cir. 1988) (finding courts to be experts regarding the reasonableness of attorney fees in their districts) (collecting cases).[8]

### (2)   *Zelle*

Zelle assisted AKF in briefing issues on appeal in 2003-2004 and, following

---

[8]  This Court has found that an hourly rate of $250 was a reasonable rate for an experienced attorney engaged in commercial litigation during 2010 and 2011 in *Laborers Health and Welfare Trust Fund for Southern California v. John Davis Allsbury*, Case No. 1:10-mc-06816-EJL-MHW (D. Idaho Mar. 1, 2011); rates of $200 each for two attorneys for work performed in 2006 and 2007 in *Independence Lead Mines, Inc. v. Hecla Mining Company*, Case No. 2:06-cv-00495-EJL-MHW (D. Idaho Mar. 28, 2008); rates ranging from $125 to $200 for attorneys and $50 to $75 for paralegals for work performed in 2007 and 2008 in *Q Management Group v. Snake River Equipment Co., Inc., et al.*, Case No. 4:05-cv-00322-MHW (D. Idaho May 29, 2008); and rates ranging from $145 to $275 for work performed from 2000 to 2004 in *Planned Parenthood of Idaho v. Lawrence Wasden, et. al.*, Case No. 1:00-cv-353-MHW.

remand, in briefing scope of easement issues in 2007.  *Millea Dec.* ¶ 2, Dkt. 259-17.  The two firms have worked together in right-of-way class actions throughout the country with an Indianapolis firm and another Washington, D. C. firm.  *Id.*  The four firms are referred to as the "Four-Firm Alliance."  *Id.*, ¶ 3.  Eight attorneys, two paralegals, and one librarian billed time to this case from July of 2001 to the present.  *Id.*, ¶ 4.  Of those time billers, one senior partner had "extensive involvement in prosecuting railroad right-of-way related property rights class action lawsuits," and one associate and one paralegal had "worked extensively on railroad right-of-way related property class action matters." *Id.* ¶¶ 5, 12, and 13.  The remaining attorneys primarily had experience with insurance, reinsurance, and subrogation matters as well as in complex litigation.

Cecilia Fex stated that she reduced by one-third the hours Zelle expended on the easement/fee and scope of easement issue for the adverse possession parcels in 2007. *Fex. Decl.* at 3, Dkt. 259-3. She notes that the three Zelle attorneys working on the issue had "a strong background in working on the nature of interests acquired by railroad companies through adverse possession nationwide," that the adverse possession issue was complex, that it appeared to have Idaho law arguably unfavorable to Plaintiffs, and that Plaintiffs were unsuccessful on the first round of briefing prior to the appeal.  *Id.*  Zelle requests hourly rates based on the rates billed to a fee-paying client for complex litigation matters between 2001 and the present which in turn reflect the rates negotiated with Zelle's largest per diem client.  *Pls.' Mem.* at 26.  Plaintiffs cite several cases upholding

rates as high as $600 per hour.

Defendant contends that rates charged to larger insurance companies are driven by different market factors than rates charged to a landowner in an inverse condemnation claim and should therefore not be the sole measure of a reasonable hourly rate in this case. *Response* at 21. Defendant further contends that the "bulk" of Zelle's work was research on issues of Idaho law. *Response* at 22 (citing Pls.' Ex. A-1, p. 30 (8/7/02 entry), pp. 40-41 (7/15-7/16/2003 entries analyzing "Idaho case law"); p. 44 (11/24/2003 entry re work on state law issues); pp. 67-73 (multiple entries re research on Idaho law).

As Plaintiffs point out in their Reply, and the Court knows based on its experience, insurance companies essentially drive market rates downward given their significant volume-based bargaining power. *Reply* at 11. *See also Millea Decl.*, Ex. K, ¶ 3, Dkt. 267-5. Therefore, the Court finds the rate reasonable given the other supporting survey information submitted by Zelle. However, the Court agrees with Defendant that Zelle should not receive Minneapolis rates for work researching Idaho law.

While Zelle may have had expertise in railroad easements, it cannot be said to have had expertise in Idaho law. Furthermore, Lary Walker's declaration states that he had over 40 years of legal experience and had handled many civil actions, damage actions against the United States Department of Agriculture, and "considerable litigation related to real estate." *Lary Walker Dec.* ¶ 3. This would suggest that he had more than ample experience to know the basics of Idaho property law and the expertise to research the

Idaho law issues.

Defendant has objected to specific instances of Zelle's charging for research on Idaho law issues.  Indeed, the cited entries' references to Idaho law make the appropriateness of the objection apparent.  No doubt, other entries in the same time period involve research on Idaho law but do not specifically reference Idaho.  However, rather than speculate that a reference to "adverse possession" on a day following a reference to "Idaho law on adverse possession" means a continuation of research on Idaho law, the Court will err in favor of Defendant when assigning a rate to each Zelle attorney researching Idaho law.  The Court will disregard the objection to the 8/7/2002 entry of Patrick McCarthy since his rate was approximately the same as the Idaho rate at the time.  Where the years of experience of a Zelle attorney is more comparable to Delton Walker's years of experience, the Court will utilize Delton's lower rate.

The Court recognizes that because Patrick Caron had been a paralegal with expertise in railroad issues for several years prior to being admitted to the bar, his time was more valuable than a typical associate with one year of experience.  However, the Court simply cannot justify valuing his services any higher than Delton Walker's then eight years of experience.  Furthermore, the Court recognizes that some knowledge of Idaho law was necessary for Zelle's attorneys to address their assigned issues.  Nevertheless, the Court finds that the specifically referenced entries address areas that could have been researched or addressed by an Idaho attorney.

The table below illustrates the difference between charging the Idaho research at Minneapolis rates versus Idaho rates.

| Date | Attorney | Charged Rate | Idaho Rate | Difference |
|---|---|---|---|---|
| 7/15/2003 | Millea (13 yrs. ) | $540 (1.8 hrs. @ $300) | $360 (1.8 hrs. @ $200 (Lary Walker)) | $180 |
| 7/16/2003 | Millea (13 yrs.) | $960 (3.2 hrs. @ $300) | $640 (3.2 hrs. @ $200 (Lary Walker)) | $320 |
| 11/24/2003 | Millea (13 yrs.) | $1,410 (4.7 hrs. @ $300) | $940 (4.7 hrs. @ $200) | $470 |
| 8/9/2007 | Caron (1 yr.) | $968 (2.93 hrs. @ $330) | $483.45 (2.93 hrs. @ $165 (Delton Walker)) | $484.55 |
| 8/15/2007 | Farrell (3 yrs.) | $2,121.33 (5.73 hrs. @ $370) | $945.45 (5.73 hrs. @ $165 | $1,175.88 |
| 8/20/2007 | Caron (1 yr.) | $660 (2 hrs. @ $330) | $330 (2 hrs. @ $165) | $330 |
| 9/7/2007 | Caron (1 yr.) | $836 (2.53 hrs. @ $330) | $417.45 (2.53 hrs. @ $165 | $418.55 |
| 9/11/2007 | Kripapuri (5 yrs.) | $737.33 (1.87 hrs. @ $395) | $308.55 (1.87 hrs. @ $165) | $428.78 |
| 9/12/2007 | Caron (1 yr.) | $660 (2 hrs. @ $330) | $330 (2 hrs. @ $165) | $330 |
| 9/14/2007 | Caron (1 yr.) | $1,716 (5.2 hrs. @ $330) | $858 (5.2 hrs. @ $165) | $858 |
| 9/16/2007 | Caron (1 yr.) | $2,310 (7 hrs. @ $330) | $1,155 (7 hrs. @ $165) | $1,155 |
| 9/18/2007 | Caron (1 yr.) | $1,914 (5.8 hrs. @ $330) | $957 (5.8 hrs. @ $165) | $957 |

| 9/18/2007 | Rongitsch | $42 (.2 hrs. at $210) | $13 (.2 hrs. @ $65) | $29 |
|-----------|-----------|----------------------|---------------------|-----|
| TOTAL | | | | $7,136.76 |

Based on the Court's computations, it will deduct $7,136.76 from the fee award based on Zelle's research of Idaho law.

### (3)    *AKF – Washington, D.C. Rates*

Plaintiffs rely on the "Updated" or "Adjusted" Laffey Matrix to establish its Washington, D. C. rates for complex litigation.  *Pls.' Mem.* at 20-25.  They compare the Updated Laffey Matrix with the USAO Laffey Matrix maintained by the U.S. Attorney's Office, and the Annual Billing Survey by the National Law Journal.  Noting that the NLJ Survey rates are significantly higher than the Updated Laffey Matrix rates, Plaintiffs opt to seek reimbursement based on the latter more conservative index.  *Id.* at 23. They contend that the Updated Laffey Matrix rates are based on years of experience rather than titles of "partner" or "associate" as the NLJ Survey does.

Plaintiffs choose the Updated Laffey Matrix over the USAO Laffey Matrix advocated by Defendant because the former considers the higher NJL Survey rates, is "pegged to more recent data," and indexes its rates to the market adjustments in the legal services arena rather than the general Consumer Price Index which includes both goods and services only 0.3% of which are legal services.

The Court has reviewed and considered the voluminous material submitted in

support of using the Updated Laffey Matrix and concurs with Plaintiffs that it is the most

accurate representation of rates for legal services in the Washington, D. C. area for

complex litigation.  In so concluding, the Court gives weight to the Federal Circuit's

recent statement implying acceptance of the use of the Updated Laffey Matrix:

> The "Updated *Laffey* Matrix" is a billing survey of District of
> Columbia market rates. The survey was conducted in
> 1988–1989 and has been recalculated in subsequent years
> using a methodology advocated by economist Dr. Michael
> Kavanaugh. The Updated *Laffey* Matrix has been used by the
> United States District Court for the District of Columbia to
> determine the amount of a reasonable attorney fee on several
> occasions. *See, e.g., Salazar v. District of Columbia*, 123
> F.Supp.2d 8, 15 (D.D.C.2000) ( "[T]he Court concludes that
> the updated *Laffey* matrix more accurately reflects the
> prevailing rates for legal services in the D.C. community.").

*Bywaters II*, 670 F.3d 1221, 1226 n. 4 (Fed. Cir. 2012) (ultimately holding that

Washington, D. C. rates were not applicable).

### C.    Fees on Fees

Defendant contends that Plaintiffs' request for fees for preparing their motion for

attorneys' fees and costs is "unreasonably high."  *Response* at 37.  Of the total 277 of

attorney and paralegal hours, Defendant objects to 106 hours for research on whether an

award of interim fees is available under the URA and any remaining hours over 80 hours

because Plaintiffs had already briefed the issue, received a decision, and briefed their

appeal in *Bywaters I* prior to preparing the pending motion.  Plaintiffs counter that

expending 3.7% of the hours requested for fee-for-fee work is reasonable.  *Reply* at 22.

MEMORANDUM DECISION AND ORDER - 45

Plaintiffs contend that the hours are reasonable both because interim fees are not prohibited under the URA and because courts have upheld fees on fees of much higher percentages than the 3.7% here. *See, e.g., Emeny v. United States*, 526 F.2d 1121, 1127 (Ct. Cl. 1975) (in 1975 awarding $69,240 in "fees for fees" in a $341,346.60 fee award); *United States v. Bill Harbert Int'l Constr., Inc.*, 601 F. Supp. 2d 45, 48-49 (D.D.C. 2009) (awarding $319, 972.04 for fees-related work where award for merits-based fees was only $303,526.16).  Plaintiffs also note that Defendant raised and lost the same issue in *Bywaters* where the fee on fees request was 13% of the total hours and the case on which it relied had found 3.4% to be reasonable. *Id.*

The Court is not privy to the supporting documentation in *Bywaters I*.  However, here, Plaintiffs' submissions were quite comprehensive and thorough.  Apparently, Defendant had argued that 288 hours in *Bywaters I* was excessive.  Here, Plaintiffs' claim is 277 hours, a mere eleven hours fewer than in *Bywaters I*.  The Court finds that because Plaintiffs had already done the research and presumably gathered much of the same supporting information as here, 277 hours is excessive.  Granted, the request here involves three firms and in *Bywaters I* involved only two firms which might account for some additional time.  Nevertheless, the Court finds that the fees on fees should be reduced by 50%.

**D.    Costs**

Plaintiffs initially requested costs of $26,734.90.  Defendant contends that the

requested costs require "some adjustment." *Response* at 38.  More specifically, Defendant objects to costs incurred for work for clients who opted out (*See* Pls.' Ex. A-2, p. 1 (12/14/98 cost of copies for Virgil Fairchild), p. 2 (4/6/99 fax in from Betty Blendu), p. 3 (5/3/99, fax out to Blendu); p. 11 (6/12/2000, fax out to Ms. Snider)). and for working meals and other "business meals" for counsel (*See* Pls.' Ex. A-2, pp. 15-16 and p. 20 (4/30/2004, Business Meals, $133.06)).  Defendant also objects to costs for two Zelle partners to travel from Minneapolis to Washington, D.C. to prepare counsel for the appellate argument ($2,231.02) and Zelle's Westlaw costs of $4,500 for August and September 2007. *Response* at 38-39.  Defendant concludes that a reduction of 20% resulting in an award of $21,387.92 is reasonable.

Plaintiffs agree that "certain small cost items" for work for opt-out clients and non-travel attorney meals should not have been included and those concede that $208.24 in costs should be excluded. *Reply* at 24.  However, citing *United Steelworkers of Am. v. Phelps Dodge Corp.*, 896 F.2d 403, 407 (9th Cir. 1990), they argue that moot court exercises are a common method of preparing for appellate argument and therefore Zelle's travel costs should be allowed. *Id*.  In response to Defendant's argument that Zelle had "no apparent expertise" on Idaho state law issues and should not be reimbursed for the excessive Westlaw costs, Plaintiffs counter that Zelle attorneys had "extensive expertise in railroad right-of-way law generally" and Plaintiffs should be able to recover for that expertise. *Id*.

Although, as discussed above, recovery for fees related to moot court exercises is allowable if reasonable, the Court finds that incurring travel expenses for such is not. AKF could have utilized one of the many other attorneys from its firm for the argument or had the Zelle attorneys appear by video conference.  Therefore, the Court finds that in addition to the conceded $208.24 in costs, the $2,231.02 for Zelle travel for the moot court exercise was not reasonably incurred.

Next Defendant objects to the approximately $4,500 in Westlaw costs incurred in August and September of 2007.  An examination of the docket reveals that the high amount was due to the filing of a response to Defendant's summary judgment motion (Dkt. 184)  on the remaining title and liability issues (Categories 2 and 3 and Categories 10, 12, and 13) and filing a cross motion for summary judgment.  *See* Dkts. 192 and 193). This would account for the high Westlaw charges for August and September.  However, given that Plaintiffs have reduced Zelle's hours by one-third, it seems appropriate to reduce the Westlaw charges by one-third as well.  Accordingly, the Court finds that the requested costs should be further reduced by $1,500.

In conclusion, Plaintiffs' requested costs shall be reduced by $3,939.26.

## CONCLUSION

Based on the findings set forth above, the Court awards fees and costs as follows:

### *Attorney Fees*

> *Requested:*                                   $2,370,397.93

*Reductions:*

| | |
|---|---|
| Work for others (conceded) | $ 2,306.70 |
| Administrative and clerical (conceded) | $   510.10 |
| Duplication | $ 7,646.80 |
| Excessive Preparation | |
|     2001 hearing | $28,669.20 |
|     2004 hearing | $43,170.80 |
| Amicus | |
|     *Phillips* | $ 6,154.89 |
| Zelle Idaho research | $ 7,136.76 |
| Fees on fees | $51,004.50 |
| ***Total:*** | $2,223,798.18 |

**Costs**

| | | |
|---|---|---|
| ***Requested:*** | Before $208.24 concession | $26,734.90 |
| ***Reduction:*** | Including $208.24 concession | $ 3,939.26 |
| ***Total:*** | | $22,795.64 |
| ***Total Attorney Fees and Costs*** | | $2,246,593.82 |

## ORDER

**IT IS ORDERED:**

MEMORANDUM DECISION AND ORDER - 49

1.   Plaintiffs' unopposed Motion for Leave to File Supplemental Authority (Dkt. 268) is **GRANTED**.

2.   Plaintiff's Motion for Attorneys Fees and Costs (Dkt. 259) is **GRANTED IN PART** as set forth above.



DATED: April 13, 2012

_____
Honorable Mikel H. Williams
United States Magistrate Judge